In Re **AMERICAN HOME PRODUCTS CORPORATION, Wyeth–Ayerst Laboratories Division of American Home Products Corporation, Wyeth Laboratories, Inc., and Wyeth–Ayerst Laboratories Company, Relators (Two Cases).**

Nos. 97–0654, 97–0655.

Supreme Court of Texas.

Argued Nov. 5, 1997.

Decided Dec. 31, 1998.

David C. Duggins, Austin, George H. Spencer, Sr., Gail Dalrymple, Jane E. Bockus, San Antonio, Alejandro Acosta, Jr., El Paso, Andrew S. Hansen, Houston, J.A. (Tony) Canales, Corpus Christi, Michael R. Klatt, Leslie A. Benitez, Austin, for Relator.

Stephen E. Harrison, II, Waco, Frank Herrera, Jr., Rogelio Lopez, San Antonio, Aubrey R. Williams, Robert M. Campbell, Thomas B. Cowart, Waco, Donald M. Hunt, Lubbock, Charles R. Watson, Jr., Amarillo, David Casso, B. Buck Pettitt, McAllen, for Respondent.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice GONZALEZ, Justice HECHT, Justice ENOCH, Justice ABBOTT and Justice HANKINSON joined.

In these consolidated original proceedings, Relators seek to disqualify two law firms that jointly represent plaintiffs in the underlying suits because one of those firms retained a legal assistant who had previously worked with counsel for the defendants in this litigation. We hold that disqualification of the Herrera firm is required because plaintiffs did not rebut the presumption that the legal assistant shared confidential information with Herrera or members of his firm. It is undisputed that the legal assistant was not isolated from this litigation but instead worked with Herrera on the underlying litigation.

I

Approximately 3,000 plaintiffs have sued American Home Products Corporation, Wyeth–Ayerst Laboratories Division of American Home Products, Wyeth Laboratories, Inc., and Wyeth–Ayerst Laboratories, Inc., (collectively Wyeth) in five separate cases in Hidalgo, Bexar, Starr, and Zavala counties. The plaintiffs used the Norplant contraceptive distributed by Wyeth. The Law Offices of Frank Herrera and Cherry, Davis, Harrison, Montez, Williams & Baird, P.C. are co-counsel for approximately 1,000 claimants. Wyeth seeks to disqualify those firms.

The mandamus proceedings before us arose out of two of the five suits, one pending in Hidalgo County and the other in Bexar County. However, the facts leading to this controversy primarily occurred in Zavala County. Because the dissent maintains that there is a material fact issue that should preclude mandamus, we will relate the undisputed facts from the record in some detail.

Wyeth retained Jesse Gamez as its local counsel in Zavala County. Shortly thereafter, Gamez introduced Diana Palacios to other counsel for Wyeth. Although it is disputed whether Gamez described Palacios as a "legal assistant," an "investigator," or a "consultant," it is undisputed that Palacios, Gamez, and Wyeth all thought that Wyeth had hired Palacios to work on the Norplant litigation. It is also undisputed that Palacios worked at the direction of counsel for Wyeth in connection with that litigation. She interviewed potential fact and expert witnesses, met with Wyeth's counsel, coordinated meetings between Wyeth's counsel and prospective consulting and testifying experts, investi-

gated individual plaintiffs at the request of Wyeth's counsel, wrote memoranda to Gamez on how to best utilize potential witnesses, and examined the jury selection process in Zavala County. Palacios also observed various unrelated proceedings in the trial court assigned to preside over the Norplant litigation in Zavala County and reported back regarding verdicts rendered in that court. The record reveals that she prepared 24 memoranda for Wyeth.

Palacios lives in Crystal City and maintains an office located within Jesse Gamez's Crystal City law office. Palacios uses Gamez's facilities and his secretarial staff and has also used Gamez's secretarial staff in his San Antonio office. Nevertheless, plaintiffs contend, and we accept as true for the purposes of this opinion, that Palacios was never employed by Gamez and that she was a "freelance consultant." The evidence also showed that Palacios had no legal training and had never before worked as a paralegal, legal assistant, or legal secretary. However, both Palacios and Gamez testified without contradiction that she actually performed work for Wyeth in the underlying litigation through the summer of 1996.

Sometime during October 1996, Palacios approached Frank Herrera, counsel for the plaintiffs, about employment. She revealed to him that she had worked with Wyeth in some capacity on the Norplant litigation but said that her work was not related to "legal" matters. Herrera was concerned that Palacios might have been employed by Gamez and called him. Gamez told Herrera that Palacios had never worked for him and that Palacios did not have access to any of Wyeth's privileged information in Norplant matters. Herrera hired Palacios on October 15. Fourteen days later, Gamez moved to withdraw as counsel for Wyeth. Wyeth claims that it did not learn of Gamez's intent to withdraw until after the trial court granted his motion, which was on November 4, 1996. However, Gamez testified that he informed Wyeth of his decision on September 23. Since his withdrawal as counsel, Gamez has been instrumental in arranging public appearances by Frank Herrera in Zavala County, an area

in which Herrera had not practiced prior to the Norplant litigation.

Before Gamez withdrew as counsel for Wyeth, Palacios had submitted a bill to him in the amount of $3,625 for her time, reflecting 72.5 hours of work for Wyeth through June. That bill was never paid. Palacios's statement for services contains the following reference to the Norplant case in Zavala County:

Cause No. 95–07–09143–CV

Maria Estella Ortiz, Plaintiff vs.

American Home Products Corp., et al., Defendants

After counsel for plaintiffs retained Palacios, she continued to work out of Jesse Gamez's offices. When Wyeth discovered that Palacios had gone to work for the Herrera firm, it filed motions to disqualify that firm and its co-counsel. A hearing was held in the Bexar County case, and the motion to disqualify was denied. By agreement, the parties submitted the record of that hearing to the Hidalgo County trial court, which also denied a motion to disqualify. Wyeth unsuccessfully sought mandamus relief from the court of appeals and then initiated mandamus proceedings in this Court. In addition to its complaints about the relationship between Palacios and counsel for plaintiffs, Wyeth seeks to disqualify plaintiffs' counsel because they engaged as an expert a physician who allegedly had been a consulting expert for defendants in this litigation.

We conclude that the trial court did not abuse its discretion by declining to disqualify counsel for plaintiffs based on their retention of an expert that Wyeth had previously attempted to retain as a consulting expert. We hold, however, that the trial court did abuse its discretion in failing to disqualify the Herrera firm because of that firm's failure to screen Diana Palacios from this litigation. With regard to Herrera's co-counsel, Stephen Harrison and his firm, the record was not fully developed, and we cannot say that the trial court abused its discretion.

## II

■ We first consider the contention that Wyeth waived any right to disqualify counsel

for plaintiffs based on their contact with Diana Palacios. It is undisputed that Wyeth first learned that Palacios was working with plaintiffs' counsel when Wyeth deposed Dr. Salvador Gonzalez, who had treated several plaintiffs. Gonzalez was designated as an expert witness by plaintiffs on February 8, 1997, and his deposition occurred less than two months later. Wyeth filed a motion to disqualify two days after this deposition.

Plaintiffs argue that Wyeth could have deposed Gonzalez sooner and that during the weeks intervening between his designation as an expert and his deposition, Wyeth participated in 48 other depositions, nine hearings, 823 depositions on written questions, and accepted 99 sets of interrogatory responses. Plaintiffs contend that Wyeth waived any complaint about the relationship between Palacios and plaintiffs' counsel.

We are not persuaded by this argument. The record reflects that Wyeth made diligent efforts to depose all of plaintiffs' experts, including Dr. Gonzalez. Even if the date of his designation could be used as the benchmark for notice to Wyeth, which it cannot, the delay in filing the motion to disqualify, which was less than two months, as a matter of law did not constitute a waiver under the facts of this case. *See Rio Hondo Implement Co. v. Euresti,* 903 S.W.2d 128, 131 (Tex.App.—Corpus Christi 1995, orig. proceeding) (holding that a two and one-half month delay does not constitute waiver of right to disqualify); *cf. Vaughan v. Walther,* 875 S.W.2d 690, 691 (Tex.1994) (holding that a motion to disqualify filed on the day of the final hearing in a child custody case was not timely when alleged conflict had been known for six and one-half months).

### III

■ We next consider Wyeth's contention that counsel for plaintiffs should be disqualified because they retained as a testifying expert a physician that Wyeth had previously retained as a consulting expert in this same litigation. Prior to being identified by plaintiffs as an expert, Dr. Salvador Gonzalez met with counsel for Wyeth on several occasions and accepted a retainer from Wyeth in the amount of $1,000 to act as a consultant in the Zavala County Norplant litigation. Dr. Gonzalez practiced medicine in Zavala County. Wyeth was unaware when it retained Gonzalez that he was a treating physician for at least some of the Norplant plaintiffs. Dr. Gonzalez was subsequently retained by plaintiffs to testify in these cases, and he refunded the retainer he had accepted from Wyeth. Wyeth contends that, during its meetings with Dr. Gonzalez, confidential information was imparted to him as a consulting expert and that these confidences presumably have now been shared with plaintiffs' counsel.

Our rules of procedure give guidance in determining the extent to which communications with an expert are discoverable. It follows that if communications with an expert may be discovered during the course of litigation by opposing counsel, that information cannot be considered confidential, and the fact that it has been shared with opposing counsel cannot be the basis for disqualification. Rule 166b(2)(e) provides in pertinent part that

[d]iscovery of the facts known, mental impressions and opinions of experts, otherwise discoverable because the information is relevant to the subject matter in the pending action but which were acquired or developed in anticipation of litigation and the discovery of the identity of experts from whom the information may be learned may be obtained only as follows:

(1) In General. A party may obtain discovery of the identity and location ... of an expert who may be called as an expert witness, the subject matter on which the witness is expected to testify, the mental impressions and opinions held by the expert and the facts known to the expert (regardless of when the factual information was acquired) which relate to or form the basis of the mental impressions and opinions held by the expert.

TEX.R. CIV. P. 166b(2)(e); *see also* TEX.R. CIV. P. 166b(3)(b).

Because Dr. Gonzalez was a treating physician, he was subject to being called as an expert witness by plaintiffs. Thus, even though some of the communications between Wyeth and Gonzalez may have been in anticipation of litigation, the facts known to Dr.

Gonzalez were subject to discovery "regardless of when the factual information was acquired." Tex.R. Civ. P. 166b(2)(e)(1). The trial court did not abuse its discretion in declining to disqualify counsel for plaintiffs after they listed Dr. Gonzalez as a testifying expert.

## IV

We do not reach a similar conclusion with regard to the relationship between Diana Palacios and Wyeth and Palacios's subsequent activities for the plaintiffs in this litigation, at least with regard to the Herrera firm. Although the record is replete with disputes over matters such as whether Palacios should be called a "freelance consultant" or a "paralegal," the core facts on which this case must be decided are not in dispute. Palacios and Wyeth both thought that Palacios had been retained to assist Wyeth in defending the Norplant litigation; Palacios did in fact perform work for Wyeth in connection with the Norplant litigation; and when she performed that work, she and Wyeth believed that she had been engaged by counsel for Wyeth to do so. The tasks she performed were the same as those that might be executed by a legal assistant as a full-time employee of a law firm or by a legal assistant in the legal department of a party.

The question of whether Herrera and his firm should be disqualified is governed by *Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex.1994), in which we held that a law firm should have been disqualified when it temporarily employed a legal secretary who had previously worked for opposing counsel. The decision in *Grant* and the decision we issued the same day in *Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831, 834–36 (Tex.1994), lay to rest all arguments the plaintiffs assert regarding the Herrera firm, which we consider in turn.

## A

■ The plaintiffs have expended a considerable amount of time and effort contending that Palacios never received confidential information from Wyeth and therefore that disqualification is improper. They point to the testimony of Palacios that she did not

receive confidential information from Wyeth and to the telephone conversation between Gamez and Herrera in which Gamez said that Palacios did not have access to confidential or privileged matters. The conclusory opinions of Gamez and Palacios regarding what is "confidential information" do not raise a fact issue. *See Robertson Tank Lines, Inc. v. Van Cleave*, 468 S.W.2d 354, 361 (Tex.1971) (holding that an employee's statement that he was in the course and scope of work when a collision occurred is a legal conclusion "without probative value and cannot raise a fact issue or support a finding of fact"); *see also Casualty Underwriters v. Rhone*, 134 Tex. 50, 132 S.W.2d 97, 99 (Tex.Com.App.1939) (holding that testimony of worker that he was working for one employer rather than another at the time of his injury was a bare conclusion and of no probative force). The memoranda Palacios prepared for Wyeth establish beyond contradiction that she was in possession of confidential and privileged information. However, the entire inquiry into what information Palacios actually possessed as a result of her work for Wyeth is irrelevant to the issue of disqualification of the Herrera firm.

We squarely held in *Phoenix Founders* that a paralegal or legal assistant who has worked on a case "must be subject to ... a conclusive presumption that confidences and secrets were imparted." 887 S.W.2d at 834. The need for that presumption is exhibited in this case. It "serves to prevent the moving party from being forced to reveal the very confidences sought to be protected." *Id.* In order to counter the assertions by plaintiffs that Palacios possessed no confidences, Wyeth tendered a number of documents for *in camera* inspection, although the trial court declined to examine them.

By attempting to focus the battle on whether Palacios received confidential information, the plaintiffs seek to avoid the application of the presumption and to shift the burden to Wyeth to come forward with confidences it shared with Palacios. But the issue is whether there is a genuine threat of disclosure, not whether disclosure materialized. *See Grant*, 888 S.W.2d at 467. The risk that

a person who has functioned as a legal assistant may disclose confidential information to a new employer under circumstances such as these is unacceptably high.

■ We reiterate what we said in *Phoenix Founders:* The presumption that a legal assistant received confidential information is not a rebuttable one. 887 S.W.2d at 834. In that case we also eschewed the notion that "confidential information" encompassed only privileged information. *Id.* Accordingly, the trial court should have assumed that Palacios acquired confidential information in considering the motion to disqualify the Herrera firm. That was not an issue about which there could be a dispute.

**B**

While the presumption that a legal assistant obtained confidential information is not rebuttable, the presumption that information was shared with a new employer may be overcome. In this regard, we have recognized a distinction between lawyers and nonlawyers. *See Phoenix Founders*, 887 S.W.2d at 834; *see also Grant*, 888 S.W.2d at 467. The Court was motivated to create this distinction by a concern that the mobility of a nonlawyer could be unduly restricted. *See Phoenix Founders*, 887 S.W.2d at 835.

The only evidence the plaintiffs offered to rebut the presumption that confidences were shared was evidence that Palacios did not possess confidential information. Plaintiffs implicitly contend that Palacios could not share information that she did not have. This argument is circular and if accepted would undercut in its entirety the absolute presumption that confidential information was imparted to Palacios.

■ Even had Herrera testified unequivocally that Palacios did not divulge anything to him that was confidential, this would not have been any evidence to overcome the rebuttable presumption that Palacios shared

information with him or members of his firm. We held in *Grant* that uncontroverted testimony from lawyers that a legal secretary did not reveal anything to them did not raise a fact question. 888 S.W.2d at 467. We explained that the presumption may be rebutted only by establishing that "sufficient precautions have been taken to guard against any disclosure of confidences." *Id.* The rationale for this requirement was considered at some length in *Grant* and *Phoenix Founders*, but, given the difficulties encountered in this case and the extensive record and briefing on issues that are wholly irrelevant, it bears repeating that *the only way* the rebuttable presumption can be overcome is: (1) to instruct the legal assistant "not to work on any matter on which the paralegal worked during the prior employment, or regarding which the paralegal has information relating to the former employer's representation," and (2) to "take other reasonable steps to ensure that the paralegal does not work in connection with matters on which the paralegal worked during the prior employment, absent client consent." *Phoenix Founders*, 887 S.W.2d at 835.

This requirement, which was recommended by the Committee on Ethics and Professional Responsibility of the American Bar Association,[1] has been adopted by this and other courts as the most effective means of safeguarding confidences of a client. *Id.* at 834–35. These precautions minimize the danger that a legal assistant will convey inappropriate information, even inadvertently. Adhering to the *Grant* and *Phoenix Founders* requirements prevents litigation such as this that needlessly expends the time and effort of the parties and the courts. The Herrera firm could have entirely avoided this controversy by taking the necessary steps to isolate Palacios from the Norplant litigation.

The plaintiffs argue that their counsel was entitled to rely on Gamez's statement that

---

1. The ABA Committee employed the following standard:

The nonlawyer should be cautioned ... that the employee should not work on any matter on which the employee worked for the prior employer.... When the new firm becomes aware of such matters, the employing firm must also take reasonable steps to ensure that the employee takes no action and does no work in relation to matters on which the nonlawyer worked in the prior employment, absent client consent after consultation.

ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1526 (1988).

Palacios was not his employee and that she had no confidential information. This is unavailing for several reasons. First, Herrera admitted that Palacios told him that she had some involvement with Wyeth and its defense counsel, although she assured him it was not in connection with "legal" matters. Herrera was put on notice at that point to implement procedures to shield Palacios from the Norplant litigation if he decided to hire her.

Second, we were faced with a similar issue in *Grant* and held that disqualification was required. 888 S.W.2d at 468. In *Grant,* a law firm hired a temporary legal secretary and had asked the agency from which her services were obtained to inquire into any possible conflicts. The secretary had been employed by the law firm for only a short time when one of the lawyers learned that she had worked on a case for opposing counsel and was now working on the same case at his firm. Although the secretary was instructed not to reveal any confidences, she was not told to avoid working on the matter. She continued to work at the firm and had been there just three weeks when the firm was informed of the full extent of her prior involvement with the suit. *Id.* at 467. She was terminated the next day, but we held that disqualification would nevertheless be required because there was "an unacceptable danger of a prohibited disclosure." *Id.* at 467–68. Given Herrera's knowledge that Palacios was involved in some capacity with Wyeth and its counsel in the Norplant litigation, Herrera should have taken prophylactic measures.

There is no indication that Herrera instructed Palacios not to work on the Norplant suits, nor is there any evidence that the "strict" adherence required by *Phoenix Founders,* 887 S.W.2d at 834, was followed. To the contrary, the uncontroverted evidence establishes that Palacios provided services to plaintiffs' counsel in both the Zavala County and the Starr County Norplant litigation. The affidavits of Frank Herrera and of Stephen A. Harrison, II, a member of the Cherry firm, filed in the Bexar County litigation each state:

Any communication by me or co-counsel or any member or employee of our firms with Diana Palacios ... were made during the course of and for the purpose of facilitating the rendition of legal services to Plaintiffs in the Zavala County and/or Starr County causes of action. Such communications were intended to be confidential. Such communications would reveal and reflect the thought processes, opinions, and analyses of Plaintiffs' counsel in rendering legal services to Plaintiffs in the Zavala County and/or Starr County causes of action.

Palacios further confirmed at the disqualification hearing that she was doing the same type of work for plaintiffs that she did for Wyeth.

On the basis of this record, the facts were undisputed that the work Palacios did for Wyeth was indistinguishable from tasks routinely performed by legal assistants. After she was retained by plaintiffs, she continued to work on the Norplant litigation. No effort whatsoever was made to deter her from doing so. Disqualification of the Herrera firm was required under these circumstances, and the trial court abused its discretion in failing to grant Wyeth's motion.

## V

Recognizing that *Grant* and *Phoenix Founders* should be dispositive of the disqualification issue, at least as to the Herrera firm, the plaintiffs have urged us not to apply the rationale of those cases to a "freelance consultant" such as Palacios. They implore us to follow a federal district court case that considered whether an expert witness who had met with counsel for one side and was then retained by the opposing party should be disqualified from testifying. *See Paul v. Rawlings Sporting Goods Co.,* 123 F.R.D. 271 (S.D.Ohio 1988). Plaintiffs have derived a two-pronged test from *Paul,* which is whether it was objectively reasonable for the first party who retained the consultant to believe that a confidential relationship existed and, if such a confidential relationship existed, whether the party actually disclosed confidences.

For the reasons we discussed above, such a test would not be adequate in the context

of a legal assistant who is subsequently hired by another firm, lawyer, or client. The fact that Palacios was "freelance" does not change the nature of her relationship with Wyeth. It is not uncommon for a lawyer or law firm to hire legal assistants and even other attorneys on a contract or "freelance" basis. An assistant or attorney may be engaged only for a specific piece of litigation or may perform discreet tasks in connection with a particular suit. Nevertheless, they perform the same types of tasks as an employee of a firm and should be accorded the same treatment as a legal assistant or attorney employed on a full-time basis. The professional obligations that inhere when performing services for a client must obtain regardless of whether that service is performed on a "freelance" basis.

## VI

The determination that the Herrera firm should have been disqualified does not end our inquiry. We must now consider whether Harrison's firm, as co-counsel, should also have been disqualified. There are two potential sources from whom Wyeth's confidential information might have been disclosed to Harrison. They are Diana Palacios and Frank Herrera, who retained Palacios and has worked with her on the Norplant litigation. We first consider Diana Palacios as a source from whom disclosure of Wyeth's confidential information to Harrison is potentially threatened.

## A

As discussed above, there is an irrebuttable presumption that Palacios is in possession of Wyeth's confidential information. And, as explained above, there is a rebuttable presumption that she shared Wyeth's confidences with the Herrera firm. The latter presumption was not rebutted in this case, and therefore, Palacios's knowledge of confidential information is imputed to Herrera and the members of his firm. Plaintiffs contend that we should not employ a theory of double imputation by imputing Palacios's imputed knowledge to Harrison. However, Diana Palacios actually obtained confidential information from Wyeth when she worked with its counsel on the Norplant litigation. Her dealings with her subsequent employer's co-counsel on the same litigation would not involve double imputation. Accordingly, we need not decide today what factors should be considered in determining disqualification when a nonlawyer is only presumed to possess confidential information and he or she has contact with co-counsel on a matter from which the nonlawyer should have been screened.

■ Some of the concerns about the preservation of a client's confidential information that we identified in *Phoenix Founders* and *Grant* are present when co-counsel works with a nonlawyer employed by the other co-counsel and the nonlawyer possesses their adversary's confidential information. Of course, there will be no basis for disqualification of co-counsel if the screening measures set forth in *Phoenix Founders* and *Grant* are put in place and followed by the firm that retained the nonlawyer. However, the failure to screen should not automatically result in the disqualification of co-counsel, as distinguished from the firm that hired and failed to screen the nonlawyer. The relationship between a nonlawyer and co-counsel is generally more attenuated than that between the nonlawyer and his or her employer. Whether co-counsel must be disqualified should depend on the nature of the contact and communications between co-counsel and the nonlawyer who was in actual possession of confidential information.

■ Disqualification is required if the nonlawyer and co-counsel worked so closely together or the nature of their communications was such that there is a substantial likelihood that confidential information was shared. Co-counsel must also be disqualified if there has been an actual disclosure of confidential information by the nonlawyer. *See Phoenix Founders*, 887 S.W.2d at 835 (holding that disqualification will always be required when confidential information relating to the representation of an adverse client has been disclosed). Once a party seeking disqualification establishes that there was contact or communication between the tainted nonlawyer and co-counsel, the burden shifts to the party resisting disqualification of

co-counsel to offer evidence that there was no reasonable prospect that the opposing party's confidential information was disclosed and that it was not in fact disclosed. This burden is properly placed on the party seeking to continue its counsel's representation rather than the party whose confidential information is at issue, for the same reasons that the burden is placed on the new employer of the nonlawyer to show that adequate screening occurred. *See Grant*, 888 S.W.2d at 467–68; *Phoenix Founders*, 887 S.W.2d at 834; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 204 cmt. d (Proposed Official Draft No. 1 1996) (observing that "[t]he lawyer or firm seeking to remove imputation has the burden of persuasion that there is no reasonable prospect that confidential information of the former client will be used with material adverse effect on the former client").

A genuine threat of disclosure does not exist if there was no contact or communication between co-counsel and the nonlawyer other than casual greetings or similar, passing contact and if co-counsel did not review or otherwise become aware of the work product of the nonlawyer. Similarly, disqualification should not be required even if there was contact or communication, or if co-counsel was privy to the work of the nonlawyer, if co-counsel demonstrates that the communication or contact was in no way related to matters from which the nonlawyer should have been screened.

If communications about matters from which the nonlawyer should have been screened did occur, disqualification nevertheless should not be required if the communication was solely from co-counsel to the nonlawyer. There is no genuine threat of disclosure of confidences by the nonlawyer if the nonlawyer did nothing but passively receive communications. *See generally Smith v. Whatcott*, 774 F.2d 1032, 1035 (10th Cir. 1985) (holding that when information flowed only from trial counsel to a tainted firm hired to handle the appeal, it was not reasonable to impute knowledge of appellate firm to trial counsel).

However, there is a substantial threat of disclosure if the nonlawyer and co-counsel work together on a matter from which the nonlawyer should have been screened by his or her employer and there are communications of a substantive nature about that matter from the nonlawyer to co-counsel. A party who resists disqualification should not be permitted to invoke the attorney-client or other privileges to shield communications from the nonlawyer to co-counsel that relate to a matter from which the nonlawyer should have been screened.

In this case, there were no screening measures taken with regard to Palacios. Indeed, Palacios continued to work on the Norplant litigation after she was retained by Herrera. If there were communications between Harrison and Palacios, plaintiffs were required to demonstrate that Harrison had no contact with Palacios that would require disqualification and that he did not have access to any of her work product on the Norplant litigation. The record was not fully developed in these areas due to the objections by plaintiffs to any discovery regarding these matters. Those objections were sustained by the Bexar County trial court.

An affidavit submitted by Harrison is not conclusive of whether he had communications with Palacios that would require his disqualification and that of his firm. The pertinent portions of Harrison's affidavit state:

> Any communication by me or co-counsel or any member or employee of our firms with Diana Palacios and/or Salvador Gonzalez were made during the course of and for the purpose of facilitating the rendition of legal services to Plaintiffs in the Zavala County and/or Starr County causes of action. Such communications were intended to be confidential. Such communications would reveal and reflect the thought processes, opinions, and analyses of Plaintiffs' counsel in rendering legal services to Plaintiffs in the Zavala County and/or Starr County causes of action.

The affidavit is not clear about which counsel, Herrera or Harrison, had confidential communications with Palacios. Nor does the affidavit indicate whether Palacios was the recipient of communications from plaintiffs'

counsel or conversely, whether she imparted substantive information to plaintiffs' counsel. From the record before us, we cannot determine whether the contacts between Harrison and Palacios created a substantial likelihood that Wyeth's confidential information was disclosed.

**B**

More difficult issues arise when co-counsel has contact with tainted co-counsel, but there is no indication that tainted counsel has actual, as opposed to imputed, knowledge of an adversary's confidential information. Plaintiffs contend that such a situation is presented by the relationship between Harrison and Herrera. We begin with the fact that, while Herrera is conclusively presumed to be in possession of Wyeth's confidential information, the record before us does not reflect that Palacios actually disclosed Wyeth's confidential information to him.

The plaintiffs assert that even if we presume, as we must, that Herrera possesses Wyeth's confidential information, Harrison cannot be disqualified without unwisely and improperly applying the concept of double imputation. When determining whether reimputation of knowledge is warranted in such circumstances, courts have considered several factors, including whether disqualified counsel actually possessed confidential information, the relationship between disqualified counsel and co-counsel, the role that both the tainted attorney and co-counsel have played in the underlying litigation, the likelihood that confidences have been shared, and the extent to which the tainted attorney has acted as a conduit of information to co-counsel. *See, e.g., Smith v. Whatcott,* 774 F.2d 1032, 1035 (10th Cir.1985); *Akerly v. Red Barn Sys., Inc.,* 551 F.2d 539, 543–44 (3d Cir.1977); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 235–36 (2d Cir.1977); *NCK Org. v. Bregman,* 542 F.2d 128, 132–35 (2d Cir.1976); *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1129 (5th Cir.1971); *Essex Chem. Corp. v. Hartford Accident & Indem. Co.,* 993 F.Supp. 241, 252 (D.N.J. 1998).

In *Smith,* Whatcott replaced his trial counsel with the firm of Nielsen and Senior for the appeal. Nielsen and Senior were then disqualified based on knowledge imputed to them from other members of their firm. They had no personal knowledge of any of Whatcott's confidences. 774 F.2d at 1033, 1034. Trial counsel re-entered the case as appellate counsel, and Whatcott's opponent then attempted to disqualify them based on their contact with Nielsen and Senior. *Id.* at 1033. The Tenth Circuit held that disqualification was not required. *Id.* at 1035. The communications between trial counsel and the Nielsen firm amounted to one five-minute conversation in which possible issues for the docketing statement were discussed. The court noted that information flowed from trial counsel to the disqualified firm, not the reverse, and that there was no opportunity for trial counsel to hear inadvertent remarks that might disclose confidential information. *Id.* at 1034.

Similarly, in *Akerly,* the Third Circuit refused to order disqualification of co-counsel, noting that the relationship between co-counsel and a lawyer who was disqualified solely on the basis of knowledge imputed from other members of his firm "was not an active one." 551 F.2d at 544. The court was also persuaded that disqualification was not required because the other firm, who was disqualified, was not "the moving force in [the] litigation" and played only a "minor role." *Id.*

However, in *Fund of Funds,* the Second Circuit required disqualification of a firm handling litigation because it had worked closely with another firm that had declined to accept representation in that litigation due to a conflict of interest but nevertheless had continued to advise and assist with the litigation behind the scenes. 567 F.2d at 227, 229–30. The "presumption of potentially improper disclosure" was sufficient to warrant disqualification. The court concluded that "[i]t was inevitable" from the close dealings between the two firms that the firm that actually handled the litigation was afforded the opportunity to benefit from the information possessed by the firm that was disqualified. *Id.* at 236.

Co-counsel was also disqualified in *Bregman,* although the facts were somewhat

unique. 542 F.2d at 135. Co-counsel had substantive consultations with a lawyer who actually possessed privileged information of a former client to whom that lawyer was now adverse. *Id.* at 130; *see also Baker v. Bridgestone/Firestone, Inc.,* 893 F.Supp. 1349, 1369 (N.D.Ohio 1995) (disqualifying co-counsel based on the frequency of contacts with lawyer who was presumed to have confidential information); *Florida Realty, Inc. v. General Dev. Corp.,* 459 F.Supp. 781, 784 (S.D.Fla.1978) (disqualifying co-counsel); *cf. Arkansas v. Dean Foods Prods. Co.,* 605 F.2d 380, 388 (8th Cir.1979) (indicating that if a lawyer who is disqualified has actual knowledge of confidential information of a former client, then co-counsel might be disqualified).

The principal case on which the Norplant plaintiffs rely is *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir.1970). In that case, Allison served as local counsel for American Can in a suit against Prosser and others. Covington & Burling was co-counsel. Allison withdrew from the case when it was discovered that one of his law partners had given tax advice to Prosser, although Allison had no personal knowledge of any matters pertaining to Prosser. *Id.* at 1126. Prosser then moved to disqualify Covington & Burling, arguing that Allison's imputed knowledge was imputed to the Covington firm. *Id.* at 1127. The Fifth Circuit refused to re-impute knowledge under the facts before it. The court expressed concern that re-imputation could require disqualification *"ad infinitum." Id.* at 1129. However, the holding in *American Can* did not rest solely on the rejection of the theory of double imputation. The court pointed out that the party seeking disqualification had failed to prove that the confidential information possessed by Allison's partner was substantially related to American Can's suit against Prosser. *Id* at 1130.

The issue of re-imputation has also arisen when an attorney moves from one firm to another. Some courts have indicated that knowledge imputed to the departing lawyer by the irrebuttable presumption that an attorney's former partners or associates shared confidential information with him or her should not be re-imputed to the attorney's new firm unless the personally disqualified attorney had actual knowledge of client confidences. *See, e.g., Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1578 (Fed. Cir.1984); *see also American Can,* 436 F.2d at 1129 (observing that "new partners of a vicariously disqualified partner[ ] to whom knowledge has been imputed during a former partnership ... need show only that the vicariously disqualified partner's knowledge was imputed, not actual"). This view is shared by the proposed Restatement. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 204 cmt. c(ii) (Proposed Final Draft No. 1 1996);[2] *see also id.* at cmt. c(ii), illus. 2 (Proposed Final Draft No. 1 1996).[3]

This Court has not had occasion to address re-imputation of knowledge. Two cases in which we considered the disqualification of attorneys who had changed firms involved situations in which the attorneys actually obtained confidential information while at their former firms. *See Henderson v. Floyd,* 891 S.W.2d 252, 254 (Tex.1995); *Texaco, Inc. v. Garcia,* 891 S.W.2d 255, 256 (Tex.1995). We held in both cases that an attorney and his new firm are disqualified from representing someone adverse to the former firm's client

---

**2.** Comment c(ii) to section 204 provides:

*Non-personally-prohibited lawyer terminates affiliation.* When a lawyer leaves a firm or other organization whose lawyers were subject to imputed prohibition owing to presence in the firm of another lawyer, the departed lawyer becomes free of imputation so long as that lawyer obtained no material confidential client information relevant to the matter. Similarly, lawyers in the new firm affiliation are free of imputed prohibition if they can carry the burden of persuading the finder of fact that the arriving lawyer did not obtain confidential client information about a questioned representation by another lawyer in the former affiliation.

**3.** An illustration in section 204(c)(ii) of the Restatement is as follows:

Client X has sought to retain Lawyer A, a partner in the firm of ABC, to represent X in a suit against Y. The suit has not yet been filed. Lawyer A is required to decline the representation because Y is also a client of Lawyer B in ABC. Lawyer A resigns from the ABC firm without having learned material confidential information of Y relevant to X's claim. The imputed disqualification is thereby removed, and Lawyer A may now represent client X.

in a substantially related matter. In *Texaco*, we said that disqualification was required even though "we do not presume that [the departed lawyer] has revealed confidential information . . . to his present client." 891 S.W.2d at 257. In *Henderson*, we rejected the argument that the new firm should not be disqualified since no confidential information had been shared with the new firm and the firm had shielded the newly arrived lawyer from any contact with the litigation. 891 S.W.2d at 254. We reasoned that it would be virtually impossible for a client of the departed lawyer's former firm to show that the lawyer had revealed confidences to his new firm and that the client should not be required to do so. *Id.; see also National Med. Enters. v. Godbey*, 924 S.W.2d 123, 132 (Tex. 1996) (holding that neither an attorney who actually possessed confidential information nor his firm could represent a client adverse to a party to a joint defense agreement under which the attorney obtained confidential information). The question that we have not had occasion to answer is whether disqualification of a new firm would be required if there were no actual knowledge on the part of the newly arrived lawyer, only imputed knowledge. *But see* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.09(b).

The facts presented in this case, however, are somewhat different from a situation in which a lawyer who did not have any contact whatsoever regarding a given case switches firms. Here, a paralegal worked on one side of litigation and then began working with a lawyer for the other side on the very same cases. The question is whether there should be any presumption that the lawyer who employed the nonlawyer shared imputed knowledge with co-counsel.

■ We share the concern expressed by the Fifth Circuit in *American Can*, 436 F.2d at 1129, that re-imputation of knowledge could lead to an unending and unwarranted string of disqualifications. At the same time, we are mindful of the concerns discussed in our decisions in *Henderson, Texaco*, and *National Medical Enterprises* regarding the inability of a client in many situations to prove that its confidences were actually revealed. We conclude that the proper balance is to place a burden of producing evidence of non-disclosure on the party resisting disqualification once the requisite showing has been made by a party seeking disqualification. A party seeking disqualification must first demonstrate that there were substantive conversations between disqualified counsel and co-counsel, joint preparation for trial by those counsel, or the apparent receipt by co-counsel of confidential information. *See generally Smith*, 774 F.2d at 1035; *Akerly*, 551 F.2d at 544. A rebuttable presumption then arises that disqualified counsel shared confidential information with co-counsel. *See Baker*, 893 F.Supp. at 1362–64; *see also Fund of Funds, Ltd.*, 567 F.2d at 225; Taskier et al., *Vicarious Disqualification of Co-Counsel Because of "Taint,* " 1 GEO. J. LEGAL ETHICS 155, 158 (1987).

■ The party resisting disqualification of co-counsel may rebut this presumption by providing probative and material evidence that the tainted person, in this case Herrera, did not disclose confidential information of his adversary. We recognize that a party seeking disqualification is placed somewhat at a disadvantage in attempting to rebut such evidence because of the attorney-client, work product, and other privileges. But a party seeking disqualification should not be permitted to broadly pierce privileges to probe whether its confidential information was actually revealed. A party seeking disqualification is entitled to determine, however, whether co-counsel have jointly prepared the case for trial or whether they have had substantive discussions regarding the case, but without inquiring into the substance of the work that has been done or of discussions between co-counsel.

■ There may be other circumstances in which a party seeking to avoid disqualification of co-counsel should not be able to shield all evidence by asserting privileges. In some cases, co-counsel may be given confidential information of an adversary by disqualified counsel without knowing or suspecting that to be the case. But if—after co-counsel or disqualified counsel have asserted that no confidential information was imparted by disqualified counsel—it later appears in discovery or at trial that co-counsel

is using confidential information against his or her adversary, that adversary is entitled to obtain the source of such information. Privileges should not be used as a shield under circumstances such as those.[4] If the only source of information sought to be used by co-counsel was an improper conduit of his or her adversary's confidential information, disqualification would be appropriate.

On the record before us, mandamus should not be issued with regard to Harrison because we cannot say that the trial courts abused their discretion. Wyeth is not precluded, however, from filing another motion in the trial courts seeking disqualification of Harrison and his firm in light of this opinion.

\* \* \* \* \*

Because the trial courts abused their discretion in failing to disqualify the Law Offices of Frank Herrera, we conditionally issue writs of mandamus directing the trial courts to disqualify that firm.

Justice SPECTOR filed an opinion concurring in part and dissenting in part.

Justice BAKER filed an opinion concurring in part and dissenting in part.

Justice SPECTOR, concurring and dissenting.

This case concerns the disqualification of two law firms representing several hundred plaintiffs in five lawsuits in four counties. The defendants filed motions to disqualify in two courts based on assertions that plaintiffs' law firms had hired two members of defendants' defense team—Diana Palacios, allegedly a paralegal, and Dr. Salvador Gonzalez, allegedly a consulting expert. After a five-day, hotly contested evidentiary hearing, the Bexar County trial court denied the motion to disqualify. The Hidalgo County trial court, after reviewing the record, reached the same result.

On the same record, this Court reaches the opposite result. I dissent to the Court's disqualification of the Herrera law firm because I believe that we cannot say that the facts and the law in this case permit both trial courts to reasonably reach but one conclusion concerning Palacios's status. See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992). While it may be reasonable to conclude that Palacios worked as a paralegal for Wyeth, it was not unreasonable on this record for the trial courts to conclude that her role did not provide her with access to confidential information. Additionally, the trial courts could have reasonably concluded that the facts and circumstances of this case do not warrant disqualification. See In re Meador, 968 S.W.2d 346, 351 (Tex.1998). Under these circumstances, I disagree with the Court's rigid application of the presumption we recognized in Phoenix Founders, Inc. v. Marshall, 887 S.W.2d 831, 834 (Tex.1994).

Disqualifying a law firm is a harsh remedy. Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656 (Tex.1990); NCNB Tex. Nat'l Bank v. Coker, 765 S.W.2d 398, 400 (Tex.1989). A disqualification motion implicates a broad range of interests, such as clients' right to the counsel of their choice, the financial burden of replacing counsel, the mobility of lawyers and nonlawyers, preservation of attorney-client confidences, and maintaining the ethical standards of the profession. See, e.g., In re Complex Asbestos Litig., 232 Cal.App.3d 572, 283 Cal.Rptr. 732, 739 (Ct.App.1991). Courts should carefully consider the prejudice to the party that inevitably results from disqualification. Kapco Mfg. Co., Inc. v. C & O Enters., Inc., 637 F.Supp. 1231, 1241 (N.D.Ill.1985). These concerns are magnified when disqualification is sought in mass litigation. Complex Asbestos Litig., 283 Cal.Rptr. at 739.

This Court recently recognized that disqualifications should not be automatic and that trial courts "must consider all the facts and circumstances to determine whether the interests of justice require disqualification." Meador, 968 S.W.2d at 351. In Meador, we observed that trial courts should consider factors such as the promptness with which the attorney notifies the opposing side of a potential conflict, the significance of any privileged information that may have been

---

4. We have held that privileges cannot be used offensively in different but analogous circumstances. *See Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105, 108 (Tex.1985).

shared, and the extent to which the nonmovants would suffer prejudice from the disqualification of their attorneys. *Id.* at 351–52. Rather than take that measured approach, the Court in this case mechanically applies the *Phoenix Founders* presumption to disqualify the plaintiffs' law firms three years into a complex case.

The paramount concern in disqualifications must be the preservation of the public's trust in the court system and the bar. *Complex Asbestos Litig.*, 232 Cal.App.3d at 586, 283 Cal.Rptr. 732. Courts should beware of parties using motions for disqualification to attain a tactical advantage. *See Sequa Corp. v. Lititech, Inc.*, 807 F.Supp. 653, 663 (D.Colo. 1992); *Kapco*, 637 F.Supp. at 1241; *see also Phoenix Founders*, 887 S.W.2d at 836. "[J]udges must exercise caution not to paint with a broad brush under the misguided belief that coming down on the side of disqualification raises the standard of legal ethics and the public's respect. The opposite effects are just as likely—encouragement of vexacious tactics and increased cynicism by the public." *Panduit Corp. v. All States Plastic Mfg. Co., Inc.*, 744 F.2d 1564, 1576–77 (Fed.Cir.1984).

\* \* \*

Although I concur in the Court's denial of mandamus relief as to the Cherry law firm, I dissent to the Court's disqualification of the Herrera law firm on this record.

Justice BAKER concurring in part and dissenting in part.

I joined the Court's May 8, 1998 opinion because I agreed with the Court that, based on the record in this mandamus proceeding, the trial courts abused their discretion and that both law firms should have been disqualified.

Today, based upon exactly the same record, the Court grants the real party in interests' motion for rehearing and decides that the Cherry law firm should not be disqualified. I disagree with the Court's decision to grant the motion for rehearing and to change its prior decision.

Accordingly, I concur in the disqualification of the Law Offices of Frank Herrera. I dissent from the Court's decision to grant the real party in interests' motion for rehearing and its decision that the trial courts did not abuse their discretion in failing to disqualify the Cherry firm.