In re GUARANTY INSURANCE
SERVICES, INC., Relator.

No. 10–0364.

Supreme Court of Texas.

July 1, 2011.

Gary Siller, John Kevin Spiller, Strasburger & Price LLP, Houston, Amy J. Schumacher, Austin, Robert M. 'Randy' Roach Jr., Roach & Newton, L.L.P., Houston, for Guaranty Insurance Services, Inc.

Ronald G. Bankston, Misty Annette Hataway, Kane Russell Coleman & Logan PC, Houston, Reagan W. Simpson, Myrna Janel Salinas, King & Spalding LLP, Austin, for Trans-Global Solutions, Inc.

Larry Parks, Mitchell Williams, Austin, for FG Holdings, Inc.

PER CURIAM.

What happens when a law firm's efforts to screen a conflict fail, permitting a non-lawyer who worked on one side of a case at one firm to work on the other side of the

same case at the opposing firm? Here, the trial court disqualified the second firm, reasoning there was a conclusive presumption that the nonlawyer had shared confidential information, despite evidence he had not. A divided court of appeals denied mandamus relief. 310 S.W.3d 630, 634. Given our prior decisions on the subject—particularly our recent decision in *In re Columbia Valley Healthcare System, L.P.*, 320 S.W.3d 819 (Tex.2010) (orig. proceeding), issued four months after the court of appeals' decision below—we conclude disqualification was not warranted. Further, because the improper disqualification was a clear abuse of discretion for which there is no adequate remedy by appeal, mandamus relief is warranted. *See In re Prudential Ins. Co.*, 148 S.W.3d 124, 135–36 (Tex.2004) (orig. proceeding) (describing when mandamus relief may issue); *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989) (orig. proceeding) (granting mandamus in context of improper disqualification). We conditionally grant mandamus relief and direct the trial court to vacate its disqualification order.

The nonlawyer in this story is paralegal Clyde Williams; the two firms are Godwin Pappas Langley Ronquillo, LLP (Godwin Pappas) and Strasburger & Price, LLP (Strasburger). Like many corporate battles, the litigation underlying this mandamus proceeding was a multi-suit affair. The lawsuit from which Strasburger was ultimately disqualified is suit number two in the litigation between Trans–Global Solutions, Inc. (Trans–Global) and Guaranty Insurance Services, Inc. (Guaranty). Trans–Global first sued Guaranty, an insurance agent, for allegedly failing to obtain appropriate insurance. Guaranty prevailed and brought suit number two (the underlying suit), seeking indemnity for the defense costs it incurred in the first suit. Strasburger represents Guaranty in the underlying suit. Trans–Global was first represented by Godwin Pappas in the underlying suit and is now represented by Kane Russell Coleman & Logan, PC (Kane Russell).

In July 2005, Williams began work as a paralegal at Godwin Pappas. While there, he billed a total of 6.8 hours in the underlying suit, reviewing the file to identify persons with knowledge of relevant facts, preparing an initial draft of a response to Guaranty's request for disclosures, assisting in document production, and communicating with opposing counsel. Williams left Godwin Pappas in November 2006. The attorneys handling the case left the firm in August 2008 for Kane Russell, taking the case with them.

In October 2008, Williams applied for a paralegal position at Strasburger. In his Employee Application, he identified Godwin Pappas as one of his previous employers, and Strasburger ran an initial conflicts check, which came back clear. At the firm's request, Williams also identified two potential conflicts due to his previous work on matters in which Strasburger represented another party. Strasburger ran a separate conflicts check on those and restricted his access to documents related to them. Williams attested that he failed to identify the underlying suit as a potential conflict because he did not remember having billed any hours for it.

In addition to the conflicts check, the firm instructed Williams several times prior to his work on this case not to disclose confidential information he gained during his previous employment—specifically during his orientation, and through the Strasburger Employee Information Handbook and a confidentiality agreement. Williams signed the handbook and the agreement. Both required him to notify his supervising attorney immediately if he became aware of a matter on which he previously worked.

Williams started work at Strasburger in January 2009. At that point, the underlying suit was already underway. The trial court granted partial summary judgment in Guaranty's favor that March, determining Trans–Global was contractually obligated to indemnify Guaranty for the defense costs incurred during the first suit. In July 2009, Williams's supervising attorney at Strasburger asked him to organize the pleadings and discovery in this case. Williams again failed to recognize the conflict and to notify the supervising attorney of its existence. In September 2009, Williams affixed bates labels to documents produced to Trans–Global and attached redacting tape to passages highlighted by an attorney. In total, Williams billed about 27 hours on the case at Strasburger.

Emails between Strasburger and Kane Russell regarding routine discovery matters made reference to Williams as a Strasburger legal assistant. A Kane Russell attorney recognized Williams as a former Godwin Pappas employee and notified Strasburger of the conflict. Strasburger immediately instructed Williams to discontinue working on the matter, not to view or access any documents related to the case, and not to disclose any information he had obtained during his employment with Godwin Pappas. Trans–Global moved to disqualify Strasburger. Though Trans–Global disputes this fact before our Court, the record is clear that Trans–Global conceded during the disqualification hearing that no confidences were actually shared.[1] After conducting that hearing, the trial court granted Trans–Global's motion and entered findings of fact and conclusions of law. In brief, it reasoned the journey was irrelevant when the final destination included a nonlawyer on both sides of the same case. It held that evidence Strasburger instituted a screening procedure for nonlawyers was immaterial under Texas law because the screening procedure did not prevent Williams from actually working on the opposite side of the case. Williams's actual work on opposite sides created a genuine threat of disclosure, which meant he was conclusively presumed to have shared confidential information, despite evidence he had not.

Guaranty unsuccessfully sought mandamus relief in the court of appeals, which essentially agreed with the trial court's analysis. While conceding Strasburger's screening procedures were "exemplary," it explained that those procedures, "however thorough, must actually be effective in order to rebut the presumption." 310 S.W.3d at 632 (citing *Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831, 833 (Tex. 1994) (orig. proceeding)). It reasoned that "where a paralegal has actually been allowed to work on both sides of the same litigation, even the most exhaustive attempts at screening cannot be deemed effective" and concluded the trial court did not abuse its discretion. *Id.* at 633–34. A dissenting justice took the position that a nonlawyer's actual work on both sides of the case by itself did not mandate disqualification of the second firm. *Id.* at 634 (Waldrop, J., dissenting).

■ Our conflict-of-interest jurisprudence recognizes distinctions between lawyers and nonlawyers, their duties, and their likelihood of contact with confidential information. We have held that a lawyer who has previously represented a client

---

1. During the hearing, Trans–Global's counsel agreed when asked by the court if he took "[opposing] counsel at his word that in fact that's true, he did not get any confidential information from this paralegal?" The judge later reiterated, without objection from Trans–Global's counsel, that Trans–Global was "conceding that on the record .... the only evidence I have is that no confidence was shared at the second law firm."

may not represent another person on a matter adverse to the client if the matters are the same or substantially related. *In re Columbia*, 320 S.W.3d at 824. If the *lawyer* works on a matter, there is an *irrebuttable* presumption that the lawyer *obtained* confidential information during the representation. *Phoenix Founders*, 887 S.W.2d at 833. When the lawyer moves to another firm and the second firm represents an opposing party to the lawyer's former client, a second *irrebuttable* presumption arises—that the lawyer has *shared* the client's confidences with members of the second firm. *Id.* at 834. The effect of this second presumption is the mandatory disqualification of the second firm. *See id.* at 833–34.

■ But the rule is different for non-lawyers. A *nonlawyer* who worked on a matter at a prior firm is also subject to a *conclusive* presumption that confidences were *obtained*. *In re Am. Home Prods. Corp.*, 985 S.W.2d 68, 74 (Tex.1998) (orig. proceeding); *Phoenix Founders*, 887 S.W.2d at 834. This rule serves "to prevent the moving party from being forced to reveal the very confidences sought to be protected." *In re Am. Home*, 985 S.W.2d at 74 (quoting *Phoenix Founders*, 887 S.W.2d at 834) (quotation marks omitted). However, the second presumption—that confidences were *shared* with members of the second firm—may be rebutted where nonlawyers are concerned. *Phoenix Founders*, 887 S.W.2d at 835. As applies here, then, there is a conclusive presumption that Williams obtained confidential information, but Strasburger may be free to rebut the presumption that Williams shared those confidences with it. The issue is whether Strasburger can do so in this situation and, if so, whether it has.

■ The only way to rebut the rebuttable presumption is:

(1) to instruct the legal assistant "not to work on any matter on which the paralegal worked during the prior employment, or regarding which the paralegal has information relating to the former employer's representation," and (2) to "take other reasonable steps to ensure that the paralegal does not work in connection with matters on which the paralegal worked during the prior employment, absent client consent."

*In re Am. Home*, 985 S.W.2d at 75 (quoting *Phoenix Founders*, 887 S.W.2d at 835). A simple, informal admonition to a nonlawyer employee not to work on a matter on which he worked before is not enough. *In re Columbia*, 320 S.W.3d at 826. And the "other reasonable measures must include, at a minimum, formal, institutionalized screening measures that render the possibility of the nonlawyer having contact with the file less likely." *Id.* Thus, effective screening methods may be used to shield the employee from the matter in order to avoid disqualification. *Id.* at 824 (citations omitted).

But we have never said that ineffective screening measures merited automatic disqualification for nonlawyers. On the contrary, we have explained that in most cases, disqualification is not required provided "the practical effect of formal screening has been achieved." *Phoenix Founders*, 887 S.W.2d at 835 (citation omitted). In *In re Columbia*, we equated this to "effective screening," and cited to the six *Phoenix Founders* factors that guide such an inquiry:

(1) the substantiality of the relationship between the former and current matters; (2) the time elapsing between the matters; (3) the size of the firm; (4) the number of individuals presumed to have confidential information; (5) the nature of their involvement in the former matter; and (6) the timing and features of

any measures taken to reduce the danger of disclosure.

320 S.W.3d at 824–25 (citing *Phoenix Founders*, 887 S.W.2d at 836). Whether screening actually works is not determinative. Instead, the "ultimate question in weighing these factors" is whether the second firm "has taken measures sufficient to *reduce* the potential for misuse of confidences to an *acceptable* level." *Phoenix Founders*, 887 S.W.2d at 836 (emphasis added).

We have also explained that knowledge of a conflict can be central to this analysis:

> The nonlawyer should be cautioned ... that the employee should not work on any matter on which the employee worked for the former employer.... *When the new firm becomes aware of such matters*, the employing firm must also take reasonable steps to ensure that the employee takes no action and does no work in relation to matters on which the employer worked in the prior employment, absent client consent after consultation.

*Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 467–68 (Tex.1994) (per curiam) (orig. proceeding) (emphasis added) (quoting ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1526 (1988)).

■ We reiterated the flexibility of this approach as well as the significance of knowledge in *In re Columbia*, which expounded upon the thrust of our prior holdings:

> Despite the screening measures used, the presumption of shared confidences becomes conclusive if: (1) information related to the representation of an adverse client has in fact been disclosed, (2) screening would be ineffective or the nonlawyer necessarily would be required to work on the other side of a matter that is the same as or substantially related to a matter on which the paralegal

has previously worked; or (3) the nonlawyer has actually performed work, including clerical work, on the matter at the lawyer's directive if the lawyer reasonably should know about the conflict of interest.

320 S.W.3d at 828. Because Williams actually worked on both sides of this case, the third scenario discussed in *In re Columbia* is implicated. Today we clarify, under that scenario: The presumption of shared confidences is *rebuttable* if the nonlawyer has actually performed work on the matter at a lawyer's directive and the lawyer reasonably should *not* know about the conflict of interest. Put differently, if the nonlawyer has actually worked on the matter, the presumption of shared confidences is *not rebuttable unless* the assigning lawyer should *not* have known of the conflict.

The question, then, is whether Williams's supervising attorney reasonably should have known that Williams worked on the same case at Godwin Pappas before coming to Strasburger. First, on this record, the supervising attorney reasonably should not have had such knowledge, rendering the presumption rebuttable. Second, Strasburger succeeds in rebutting this presumption. We discuss each in turn.

■ Prior to Williams's discovery by a Kane Russell attorney, there is no evidence Strasburger was ever notified of the conflict. Williams never informed Strasburger that he had worked on the suit. And the fact that he worked less than seven hours on the case certainly supports Williams's claim that he simply forgot he had engaged with the litigation; the fact that he willingly disclosed two other potential conflicts suggests he was not averse to disclosing potential conflicts.

■ Further, the conflicts check came back clear. Trans–Global argues Stras-

burger would have discovered the conflict but for its ineffective screening system. We have never required perfection in screening conflicts. And as Strasburger points out, Trans–Global had changed representation, from Godwin Pappas to Kane Russell, since Williams had worked for the other side, and Godwin Pappas had itself changed names several times. Aside from its computerized conflicts check, Strasburger had specifically asked Williams to identify any conflicts of which he was aware. In addition, Trans–Global conceded that Strasburger's system was adequate during the oral hearing on the motion to disqualify, at one point stating, "we have no complaints about their screening procedure," and remaining mum when the trial court stated that Trans–Global had conceded that Strasburger's screening methods were sufficient to meet the *Phoenix Founders* and *In re American Home* standards. The failure of a screening method to actually screen a tainted party will not translate into disqualification where "the practical effect of formal screening has been achieved." *Phoenix Founders*, 887 S.W.2d at 835 (citation omitted). That effect was achieved here because there is no evidence the supervising attorney reasonably should have known about the conflict.

■ The screening was also effective under the fact-intensive, multi-factor inquiry of *Phoenix Founders*. There was undoubtedly a substantial relationship between the former and current matters— they stemmed, after all, from the same litigation. However, it is worth noting that by the time Williams first worked on the case as a Strasburger employee in July 2009, summary judgment had limited the scope of the matter, leaving only the deter-

mination of the amount of attorney fees from the first suit and whether fees could be recovered in the second indemnity suit. The other factors further indicate effective screening.[2] Almost two years passed between Williams's exit from Godwin Pappas and his application to Strasburger; another three months after that passed before he gained employment there; and another six months after that went by before he actually worked on the case. Only one person—Williams—is presumed to have confidential information, and Williams's minimal work on the case (less than 34 hours across both firms) also suggests effective screening. Finally, the evidence indicates that Strasburger took numerous measures, discussed below, to prevent and later to address the danger of disclosure.

Strasburger clears the hurdles to presumption-rebuttal erected by *In re American Home* and *Phoenix Founders*. At the outset, via his orientation, the Strasburger Employee Information Handbook, and the confidentiality agreement, Strasburger instructed Williams not to engage with matters on which he had worked previously. Those documents also directed Williams to notify his supervising attorney immediately if he realized a conflict. Strasburger also took other reasonable steps to ensure Williams did not work on matters from his prior employment. Specifically, it had in place formal, institutionalized screening procedures, which even the court of appeals noted were "nothing if not thorough." 310 S.W.3d at 633. The trial court similarly noted Strasburger had "presented evidence that it had instituted a screening procedure for nonlawyers," and even Trans–Global itself stated "we have no complaints about their screening procedure." Strasburger also presented evi-

---

**2.** Because the parties point to no evidence in the record as to the size of either firm, we do not include this factor in our analysis.

dence that it strictly adhered to its formal screening process when it hired Williams. When Williams identified two closed matters on which he had worked and in which Strasburger had also been involved, Strasburger removed his access to those files. Strasburger also ran a conflicts check based on Williams's previous employers, and it revealed no additional conflicts. Williams signed a confidentiality agreement, certifying that he disclosed the existence of any conflict of interest of which he was aware at the time. He also acknowledged receiving, reading, and signing the Employee Information Book, which informed him of his duty to keep confidential information obtained during his previous employment.

Further, Williams attested that upon discovering the conflict, Strasburger instructed him not to work further on this case, not to access related documents, and not to disclose any information. While such a restriction is not a stand-alone requirement for rebutting the presumption, these additional steps further distinguish this case from others where we have disqualified firms for a nonlawyer's actual work on both sides of a case. For example, in *In re Columbia*, the paralegal had similarly performed limited work on both sides of the same case. 320 S.W.3d at 823. But the second law firm did not have any formal screening measures in place and, upon realizing a conflict existed, did not immediately remove the nonlawyer's access to the case. *Id.* In fact, the supervising attorney asked the nonlawyer to work on the case even after the conflict came to light. *Id.* Strasburger's efforts after discovering the conflict parallel and reinforce its thorough attempts to preempt the conflict in the first place.

For these reasons, and without hearing oral argument, *see* Tex.R.App. P. 52.8(c), we conditionally grant mandamus relief and direct the trial court to vacate its order granting the motion to disqualify. We are confident the trial court will comply, and the writ will issue only if it does not.